UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DULA A., | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 cv 4253 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| ANDREW M. SAUL, Commissioner of the Social Security Administration[1], | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dula A.[2] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her disability benefits. Plaintiff has filed a motion for summary judgment [11]; the Commissioner has filed a cross-motion for summary judgment [dkt. 24]. As detailed below, the Court grants Plaintiff's motion for summary judgment [dkt. 11], denies the Commissioner's motion for summary judgment [dkt. 24], and remands this matter for further proceedings consistent with this Memorandum Opinion and Order.

**I.  Background**

   **a.  Procedural History**

In December 2014, Plaintiff protectively filed for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), alleging disability beginning June 20, 2014. [Administrative Record ("R.") 12.] After her applications were denied initially and on reconsideration, Plaintiff requested an administrative hearing. [R. 12, 101-02.] On March 1, 2017, Plaintiff appeared with counsel and testified at a hearing before Administrative Law Judge ("ALJ")

---

[1]  As of June 4, 2019, Andrew M. Saul is the Commissioner of the Social Security Administration. Pursuant to Federal Rule Civil Procedure 25(d), he is hereby substituted as Defendant.

[2]  In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

Janice Bruning. [R. 33-51.] A vocational expert ("VE") also testified. *Id.* On May 30, 2017, the ALJ determined that Plaintiff was not disabled. [R. 12-23.] On April 18, 2018, after a review of the ALJ's decision, the Appeals Council issued a decision affirming that Plaintiff had not been under a disability from his alleged onset date to the date of the ALJ's decision. [R. 1-6.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. Plaintiff filed an action in this court on June 19, 2018, seeking review of the Commissioner's decision.

### b. Relevant Medical Background

Plaintiff was born in 1967 and was 47 years old on her alleged disability onset date. [R. 52.] Plaintiff came to the United States from Bosnia in August 1997, after living through the Bosnian War. [R. 315.] During the war, soldiers broke in to Plaintiff's home and threatened to kill her if she did not disclose where her husband was. [R. 231, 365-84.] Plaintiff's husband was later taken to a concentration camp, where he was tortured. [R. 315.] Since that time, Plaintiff has experienced symptoms of depression, anxiety, and PTSD. *Id.*

On January 18, 2014, Dr. Jasminka Kostic, M.D., diagnosed Plaintiff with chronic fatigue syndrome and fibromyalgia, and prescribed Lyrica. [R. 292.] In May 2014, when Plaintiff presented to Dr. Kostic with headaches, dizziness, palpitations, as well as pain in her neck, upper back, arms, elbows, lower back, buttocks, thighs, and knees, Dr. Kostic increased Plaintiff's dosage of Lyrica. [R. 291.] After two and a half weeks of little improvement, Dr. Kostic again increased her dosage of Lyrica. [R. 290.] Plaintiff's complaints of pain and fatigue continued into March of 2015. [R. 288-89.]

In addition to her chronic fatigue syndrome and fibromyalgia, Plaintiff suffers from multiple psychiatric impairments, and has been receiving psychiatric care since prior to her onset date. In November 2013, Dr. Lucyna Puszkarska, M.D., a psychiatrist, conducted a complete psychiatric evaluation of Plaintiff. [R. 315-17.] Dr. Puszkarska noted that Plaintiff has symptoms of anxiety several times a week, including apprehensiveness, shortness of breath, increased heart rate, cold hands, and

2

other indicators of autonomic instability. [R. 315.] Dr. Puszkarska also noted Plaintiff's difficulties concentrating, episodes of dizziness, and fears of losing control or dying. *Id.*

Dr. Puszkarska noted that as a result of PTSD arising out of traumatic events involving actual or threatened death or serious injury during the Bosnian War, Plaintiff experienced feelings of intense fear and helplessness. *Id.* She experiences recurring, intrusive, and distressing recollections of the traumatic incident, recurring distressing dreams of the incident, and flashbacks. *Id.* She exhibits diminished interest in important affairs. *Id.* Dr. Puszkarska treated Plaintiff for anxiety, major depressive disorder with psychotic features, and PTSD. [R. 316-17.] She was prescribed three psychotropic medications: Pristiq, Clonazepam, and Abilify. *Id.* She was assessed with a Global Assessment of Functioning (GAF) score of 45.[3] *Id.*

After three follow up visits, Plaintiff reported slight improvement in some of her symptoms. [R. 318-322.] In May 2014, Dr. Puszkarska noted that Plaintiff had only a slight response to treatment, and assessed her with a GAF score of 50. [R. 322-23.] On October 23, 2014, Plaintiff returned to Dr. Puszkarska complaining of excessive worry, decreased sociability, recurrent recollections of trauma, and flashbacks. [R. 324-25.] At that time, Dr. Puszkarska again assessed a GAF score of 45. *Id.*

On December 5, 2014, a mental status examination revealed soft and slow speech, constricted affect, poor eye contact, and signs of anxiety. [R. 326-27.] Although Plaintiff noted her medications made her drowsy, her dosage of Pristiq was increased, and her GAF score was slightly raised to 50. *Id.* In January 2015, Plaintiff's dosage of Clonazepam was increased because of her ongoing signs of anxiety. [R. 328-29.] Dr. Puszkarska noted that Plaintiff needed assistance with activities of daily living.

---

[3] Although the Global Assessment of Functioning ("GAF") is not used in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM V"), it was used in the previous version of that text ("DSM IV"), and is often relied on by doctors, ALJs, and judges in social security cases. *See Steele v. Colvin*, 2015 WL 7180092 at *1 (N.D. Ill. Nov. 16, 2015). The lower the GAF score, the greater the degree of impairment. *Id.* A score between 41 and 50 indicates "serious symptoms" such as suicidal ideation, severe obsessional rituals, or frequent shoplifting or "any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work)." A score between 51 and 60 represents "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* Anything above 60 would indicate mild symptoms. *Id.*

3

*Id.* The following month, it was noted that Plaintiff's treatment response had been inadequate, and her ability to perform self care had been reduced. [R. 330.] On March 6, 2015, Plaintiff's dosage of Abilify was increased. [R. 332-33.] In Dr. Puszkarska's April 7, 2015 treatment note, he indicated that Plaintiff "has had an inadequate response to treatment" and that Plaintiff's GAF score remained at 50. [R. 334.]

On April 28, 2015, Plaintiff's GAF score still remained at 50, and her medications were again adjusted, with the Clonazepam increased, Abilify stopped, and Zolpidem and Seroquel initiated. [R. 336-37.] In October 2015, Dr. Puszkarska noted that Plaintiff's symptoms had stabilized, and treatment with the medications was continued with some adjustments. [R. 349-50.] Her GAF score was assessed at 55. *Id.* The following month, however, Dr. Puszkarska noted that Plaintiff's symptoms seemed worse, and he added several medications. [R. 352.] He did, however, assess Plaintiff at a GAF score of 60. *Id.* In December of 2015, Plaintiff's symptoms again seemed to stabilize, but Dr. Puszkarska increased dosages of various medications and kept Plaintiff's GAF score at 60. [R. 353-54.]

On February 10, 2016, Plaintiff's psychiatric care was transferred to Dr. Cezary Dudzinski, M.D., a board-certified psychiatrist. [R. 361.] Dr. Dudzinski confirmed the diagnoses of major depression, PTSD, and anxiety disorder, but noted Plaintiff indicated she currently felt more stable than she had in the past. *Id.* Notes from an examination on April 6, 2016 indicate widely varying sleep patterns (ranging from four to twelve hours per night). [R. 360.] Plaintiff continued treatment with Dr. Dudzinski through September 19, 2016. [R. 358-59.]

On November 1, 2016, Plaintiff began receiving twice monthly psychiatric care at the Hamdard Center. [R. 385.] At the initial visit, in addition to relating her history of survival during the Bosnian War, she noted that she has only one friend, poor social support, depressed mood, anhedonia,[4] anxiety, increased appetite, increased fatigue, decreased sleep, and decreased

---

[4] Anhedonia is the absence of pleasure from things that would ordinarily be pleasurable. *Stedman's Medical Dictionary* (2014).

4

concentration. [R. 383-85.] In addition, Plaintiff was afraid to be alone, had nightmares, exhibited hypervigilance, and avoided reminders related to the war. *Id.* Plaintiff's November 15, 2016, records indicate she was afraid of encountering others on walks. [R. 381.]

On December 2, 2016, Plaintiff was observed to be emotionally labile, with a constricted affect. [R. 377.] At that time, doctors adjusted her medications, noting poorly controlled anxiety and mood. *Id.* On December 21, 2016, despite increased medication dosages, Plaintiff reported trouble sleeping and recurring nightmares of break-ins. [R. 372.] She was too afraid to use her basement exercise bike because she feared break-ins.[5] [R. 374.] The January 18, 2017 notes indicate Plaintiff was still struggling with significant depression and anxiety, and that she found it difficult to motivate herself to leave her house, both due to her tendency to isolate herself and the cold weather. [R. 370.] She was observed to be sad and tearful with a flat affect. *Id.* At the time, her medications included Clonazepam, Quetiapine, Sertraline, Temazepam, Trazodone, and Venlafaxine. [R. 369.]

On August 11, 2016, Dr. Kostic, who had treated Plaintiff since January 2014, completed a Fibromyalgia Residual Functional questionnaire. [R. 355-56.] Dr. Kostic confirmed that Plaintiff meets the American Rheumatological Society's criteria for fibromyalgia, and stated that Plaintiff's prognosis was poor. [R. 355.] She noted numerous symptoms of fibromyalgia, including multiple tender points, nonrestorative sleep, morning stiffness, depression, dizziness, numbness and tingling, lack of endurance, impaired concentration, dysmenorrhea, anxiety, and frequent, severe headaches. *Id.* She noted bilateral pain in the shoulders, arms, hands/fingers, hips, and legs, and described Plaintiff's pain as an eight to ten out of ten. *Id.* She noted that Plaintiff's pain is precipitated by weather changes, movement or overuse, stress, static positions, fatigue, hormonal changes, and humidity. *Id.*

In the questionnaire, Dr. Kostic also found that emotional factors contribute to the severity of Plaintiff's symptoms, noting that Plaintiff's concentration and attention are constantly impacted by

---

[5] Plaintiff also testified at the Administrative Hearing that she doesn't like to take showers because she is scared and worried that someone may break into her house while she is in the shower. [R. 39.]

fatigue and pain, and that she has marked limitation in her ability to deal with work stress. [R. 355-56.] She also indicated that Plaintiff endures side effects from her prescription medications, including dizziness, palpitations, drowsiness, gastrointestinal bleeding, constipation, and blurred vision. [R. 356.] Dr. Kostic indicated that Plaintiff would sometimes need to lie down at unpredictable intervals during a work shift and would likely be absent more than three times per month as a result of her symptoms. *Id.* In addition to Plaintiff's fibromyalgia, Dr. Kostic also endorsed other diagnoses of chronic fatigue syndrome, major depression/anxiety, hypothyroidism, and PTSD. *Id.* Dr. Kostic opined that Plaintiff would be unable to sustain any kind of work on a full time basis. *Id.*

On February 16, 2017, Dr. Dudzinski, Plaintiff's treating psychiatrist since February 2016, completed an assessment of Plaintiff's ability to do work related activities in light of her mental impairments. [R. 386-90.] He endorsed diagnoses of major depressive disorder, recurrent with psychotic features, PTSD, and anxiety disorder. [R. 386.] He noted symptoms of depression, low energy, hopelessness, helplessness, paranoia, auditory hallucinations, sleep disturbance, flashbacks, nightmares, and high anxiety. *Id.* He opined that Plaintiff's condition could be life-long, with periods of exacerbation. [R. 386-87.] He indicated that Plaintiff's functional limitations included poor stress tolerance, compromised ability to focus and concentrate, memory problems, and sleep disturbance. [R. 387.] He stated that Plaintiff suffers from the medication side effects of tiredness, fatigue, dizziness, abdominal pain, and nausea. *Id.* He opined that Plaintiff would likely decompensate if exposed to the perceived stress of a routine work setting. *Id.* He further asserted that Plaintiff is not malingering or exaggerating her symptoms. *Id.*

Dr. Dudzinski also opined that Plaintiff would be markedly limited in her ability to understand and remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. [R. 388.] It was Dr. Dudzinski's opinion that Plaintiff would be markedly limited

6

in her ability to complete a normal work day and work week without interruption from psychologically based symptoms, and in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. [R. 389.] Additionally, Dr. Dudzinski indicated Plaintiff would have moderate limitations in her interactions with coworkers and supervisors, and in her ability to adapt to changes in the work setting. *Id.* Finally, Dr. Dudzinski added a narrative explanation of Plaintiff's history of trauma and her continuing struggles with daily functioning, wherein he noted that Plaintiff had been unable to keep any job for many years because her condition severely compromises her ability to maintain concentration and attention to detail, and she becomes distracted by auditory hallucinations of loud noises that trigger memories of war. [R. 390.]

### c. The ALJ's Decision

On May 30, 2017, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 12-23.] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 20, 2014. [R. 14.] At Step Two, the ALJ found that Plaintiff had the severe impairments of PTSD, depression, anxiety, and visual disorder. [R. 14.] The ALJ also detailed Plaintiff's nonsevere impairments of hypertension, lower back pain, fibromyalgia, obesity, and chronic fatigue syndrome. [R. 15.] At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. *Id.*

Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[6] to perform a full range of work at all exertional levels but with the following nonexertional limitations: understand, remember, and carry out no more than simple, routine tasks; performing the same tasks day in, day out; no public contact and no more than occasional contact with coworkers and supervisors; no engagement in teamwork situations, but can work independently; avoidance of all

---

[6] RFC is defined as the most one can do despite one's impairments. 20 C.F.R. §§ 404.1545, 416.945.

7

exposure to work hazards, such as unprotected heights and dangerous moving machinery; no commercial driving; no climbing of ladders, ropes, or scaffolding; avoidance of concentrated exposure to vibration; and avoidance of noise at the jackhammer level or louder. [R. 17-18.] At Step Four, the ALJ determined that Plaintiff was capable of performing her past relevant work as an assembler, which she identified as both DOT #709.684-014 (medium exertion, unskilled, SVP 2) and DOT #733.685-010 (light exertion, unskilled, SVP 2).[7] [R. 22-23.] Because of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 23.]

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are

---

[7] These are two different assembler positions that comprise Plaintiff's past relevant work. [R. 22-23, 49.]

8

jobs that the claimant is able to perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

### III. Discussion

Among other things, Plaintiff asserts that the ALJ failed to take into account the Plaintiff's limitations in concentration, persistence, and pace when crafting the RFC in this case, and that this is grounds for remand. We agree.

Here, the ALJ found Plaintiff had moderate limitations in concentration, persistence, and maintaining pace, and the ALJ specifically highlighted Plaintiff's reported difficulties concentrating and documented that at least one of Plaintiff's medical providers noted an issue in this area. [R. 16.] Despite this, the ALJ found Plaintiff could perform work at all exertional levels except that she is limited to understanding, remembering and carrying out no more than simple, routine tasks in jobs

that required no public contact, no more than occasional contact with coworkers and supervisors, and no team work. [R. 17.]

The Seventh Circuit has repeatedly found that requiring a claimant to perform only "simple" work—whether in the form of tasks performed, judgments and decisions made, or instructions followed—does not account for moderate limitations in concentration, persistence, or pace. *Winsted v. Berryhill*, 923 F.3d 472, 476-77 (7th Cir.) ("simple, routine, repetitive tasks" limitation); *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) ("simple work instructions, "simple work place judgments" and "routine work" limitations); *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) ("simple, routine, and repetitive tasks" limitation); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618, 620-21 (7th Cir. 2010) ("routine, repetitive tasks with simple instructions" limitation); *Mischler*, 2019 WL 1299948, at *5 (simple, routine, and repetitive task limitation); *Paul v. Berryhill*, 760 F. App'x 460, 463, 465 (7th Cir. 2019) (same); *Radosevich v. Berryhill*, 759 F. App'x 492, 494-95 (7th Cir. 2019) ("simple, work-related decisions" limitation); *see also Lear v. Berryhill*, 2018 WL 1225046, at *7 (N.D. Ind. Mar. 9, 2018) (limiting claimant to "simple, routine work and to no more than average production requirements" does not "adequately capture moderate limitations in concentration, persistence, and pace" in Seventh Circuit); *Ingle v. Colvin*, 2016 WL 270006, at *8-9 (S.D. Ill. Jan. 22, 2016) (same).[8]

This is so because an individual's ability to perform simple work is distinct from her ability to "maintain the concentration and focus needed to sustain her performance of" tasks for an "extended period" of time. *See Paul*, 760 F. App'x at 465; *O'Connor-Spinner*, 627 F.3d at 620 ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a

---

[8] The Court finds Defendant's reference to *Burmeister v. Berrryhill*, 920 F. 3d 507 (7th Cir. 2019) unavailing, as the ALJ in that case relied upon the report of an examining expert, not the non-examining State agency reviewers relied upon here. Moreover, the copious case law cited above confirms that a "simple, repetitive tasks" (or similar) limitation, on its own, is insufficient to communicate to a VE a claimant's significant limitations in the area of concentration, persistence, or pace and, thus, a VE would not know to exclude jobs that would present significant challenges to a claimant with such limitations. *Winsted*, 923 F.3d at 477 (citing *O'Connor-Spinner*, 627 F.3d at 620; *Moreno*, 882 F.3d at 730).

given complexity."); *Mischler*, 2019 WL 1299948, at *5 ("A task can be simple, but a person with a poor attention span may still become distracted and stop working."). Restricting a person to simple routine tasks, as the ALJ has done here, is unrelated to the question of whether an individual with or difficulties with concentration, persistence, and pace can perform such work. *Varga*, 794 F.3d at 814.

Even if we accept, *arguendo*, the ALJ's characterizations of moderate limitations in three of the four paragraph B functional areas,[9] the ALJ's RFC assessment fails to realistically accommodate her Plaintiff's functional deficits, particularly in terms of diminished concentration and significant distractibility (*see* Relevant Medical Background, Section I(b), supra). The ALJ's limitation to simple, routine tasks is particularly problematic under Seventh Circuit precedent in light of Plaintiff's acknowledged moderate limitations in concentration, persistence, and pace.

With regards to maintaining concentration, persistence, and pace, the ALJ points out that that Plaintiff is "able to perform chores on medication;" "able to follow a schedule well enough to travel to Europe" nearly yearly;[10] reported being alone "a lot" which the ALJ thought demonstrated the "ability to persist in certain tasks;"[11] planted flowers; was able to drive to the store; and was able to concentrate for the duration of the administrative hearing.[12] [R. 16-17.] The Court is not convinced that a reasonable person would find that an individual who can do these meager activities, even in concert, would be able to maintain concentration, persistence, or pace for an extended period of time at all exertional levels as specified by the ALJ. *Paul*, 760 F. App'x at 465. This is particularly true in the

---

[9] The SSA has identified four broad "Paragraph B" functional areas in which they rate the degree of a claimant's functional limitation: 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentration, persistence, or maintaining pace; and 4) adapting or managing oneself. 20 C.F.R. § 416.920a. Here, the ALJ found moderate limitations in the first three categories [R. 16], and a mild limitation in the last [R. 17]. Plaintiff disputes that we should accept the ALJ's finding of only moderate limitations in these areas, but we need not reach this issue because we have remanded on another basis.

[10] During the Administrative Hearing, Plaintiff testified she was always accompanied by her husband on these trips to her native home town, and while there she spends her time with family. [R. 41-42; dkt. 12, p. 9.]

[11] The ALJ does not specify which certain tasks she thought Plaintiff would be able to persist at due to her being alone a lot.

[12] The entire administrative hearing lasted 26 minutes. [R. 33, 51 (start tine if 9:08 a.m.; end time of 9:34 a.m.).]

11

case of Plaintiff, whose treating physician specifically included among Plaintiff's functional limitations a compromised ability to focus and concentrate. [R. 387.] The Court cannot follow any logical bridge from this evidence to the RFC crafted by the ALJ and, thus, substantial evidence does not exist to support the ALJ's decision and remand is required. *Scheck*, 357 F.3d at 699; *Richardson*, 402 U.S. at 401.

## IV. Conclusion

For the foregoing reasons, the Court must reverse and remand for proceedings consistent with this Memorandum Opinion and Order. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by Plaintiff. Plaintiff's motion for summary judgment [dkt. 16] is granted; the Commissioner's motion for summary judgment [dkt. 21] is denied.

Entered: 7/26/2019  _____
Susan E. Cox,
United States Magistrate Judge